1

```
 1                      IN THE UNITED STATES DISTRICT COURT
                        FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                                EASTERN DIVISION

 3    JOSEFINA LOZANO, ROBERT PIERCE,  )
      DORICE PIERCE, and DELLA SIMS,   )
 4                                     )
                     Plaintiffs,       )
 5                                     )
        v.                             )  No. 19 cv 6411
 6                                     )
      CITY OF ZION, a municipal        )
 7    corporation, Mayor BILLY         )
      McKINNEY, Commissioner of        )
 8    Building and Public Property     )
      JACQUELINE HOLMES, Director of   )
 9    the Zion Building Department     )
      RICHARD IANSON, and Inspector    )
10    WARREN FERRY, in their official  )
      capacities,                      )  Chicago, Illinois
11                                     )  May 26, 2021
                     Defendants.       )  1:30 p.m.
12
             TRANSCRIPT OF PROCEEDINGS - TELEPHONIC MOTION HEARING
13                  BEFORE THE HONORABLE JOHN F. KNESS

14    APPEARED TELEPHONICALLY:

15    For the Plaintiffs:        INSTITUTE FOR JUSTICE
                                 BY:  MR. ROBERT ANDREW PECCOLA
16                                    MR. ADAM FORESTER GRIFFIN
                                 901 North Glebe Road
17                               Suite 900
                                 Arlington, Virginia  22203
18                               (708) 682-9320

19                               EIMER STAHL LLP
                                 BY:  MR. JAMES W. JOSEPH
20                               224 South Michigan Avenue
                                 Suite 1100
21                               Chicago, Illinois  60604

22    For the Defendants:        KNIGHT HOPPE KURNIK & KNIGHT, LTD.
                                 BY:  MR. WILLIAM W. KURNIK
23                               5600 North River Road
                                 Suite 600
24                               Rosemont, Illinois  60018
                                 (847) 261-0700
25
```

Nancy C. LaBella, CSR, RDR, CRR
Official Court Reporter
219 South Dearborn Street, Room 1728
Chicago, Illinois  60604
(312) 435-6890
NLaBella.ilnd@gmail.com

1    (Proceedings held remotely, via telephone conference:)

2         THE CLERK:  19 cv 6411, Lozano v. City of Zion.

3         THE COURT:  Good afternoon.  This is the judge.

4         Who is present on behalf of the plaintiff?

5      (Brief pause.)

6         MR. PECCOLA:  This is Rob Peccola, your Honor, on

7    behalf of plaintiff.  And my co-counsel Adam Griffin is here

8    as well.

9         THE COURT:  Good afternoon to --

10        MR. JOSEPH:  Good afternoon, your Honor.  James

11   Joseph on behalf of plaintiffs as well.

12        THE COURT:  Good afternoon to each of you.  And I

13   should have said plaintiffs, not plaintiff.  Obviously there's

14   more than one plaintiff.  But thank you for being here and

15   thank you for your patience.

16        Who is appearing on behalf of the defendants?

17        MR. KURNIK:  Good afternoon, your Honor.  William

18   Kurnik on behalf of the City of Zion.

19        THE COURT:  Good afternoon to you, sir.  And you're

20   representing all defendants, correct?

21        MR. KURNIK:  I am, your Honor.

22        THE COURT:  Excellent.  As I said, my thanks to

23   everyone on the call for your patience in getting started.

24   We've been a little bit behind today.  I thank you for

25   waiting.  I know your time is valuable, so we will get

1    started.

2         My hope today was to just have a reasonable amount of

3    time for argument.  We don't need to be here all afternoon,

4    but I did want to give the parties a chance to supplement

5    anything that they wanted to concerning the briefing that's

6    been submitted on this pending motion to dismiss.  And I will

7    likely have a handful of questions as well.

8         And also, in talking about delays, I know that this

9    motion has been pending for a long time.  It's a weighty

10   motion.  These are weighty issues.  And you had the misfortune

11   of having this case reassigned to a new judge right before a

12   pandemic hit, so kind of a double whammy for the parties.  But

13   we are hoping to use the occasion of this argument to prompt

14   getting a ruling out on this as soon as we can.  But the

15   argument will help me understand the issues better, so I

16   appreciate your time on that.

17        My thought was to offer each side ten minutes or

18   so -- I'm not going to keep a stopwatch up here -- but ten

19   minutes or so to say whatever it is you want to say.  If you

20   run over, that's fine.  If it gets too long, I'll gently stop

21   you.  You also don't have to get up to ten minutes if you feel

22   you've made your points.  I'll try not to interrupt either

23   side with questions, but I can't promise that.

24        So I assume, since it is the defendants' motion, that

25   you'd like to go first.  But is there any objection on the

4

```
 1    part of the plaintiffs to that approach?
 2              MR. PECCOLA:  No objection, your Honor.
 3              THE COURT:  Hold on one second, please.
 4         (Brief pause.)
 5              THE COURT:  I have some logistical requests for you
 6    from our staff here; and that is, first of all, please
 7    identify yourselves when you speak because we unfortunately
 8    don't know you well enough by voice yet to do a voice
 9    identification; and, second, Mr. Kurnik, if you are on
10    speaker, we'd respectfully ask that you take yourself off of
11    speaker.  It's harder for us to hear.
12         (Brief pause.)
13              MR. KURNIK:  I am now off speaker, Judge.
14              THE COURT:  Thank you.
15              MR. KURNIK:  This is Bill Kurnik.
16              THE COURT:  Thank you, Mr. Kurnik.  And if you're
17    ready, you may proceed and then we'll turn to the plaintiffs
18    and then I'll give you a little bit of rebuttal time.  So
19    proceed when you're ready.
20              MR. KURNIK:  Okay.  I'm ready, your Honor.  I plan to
21    avoid duplicating matters that were addressed in our opening
22    memorandum and reply.
23              I'd just like to point out that at issue in this case
24    is the City of Zion ordinance Section 10-180 as amended.  It
25    has been filed with the Court as document No. 27-2.  It was
```

1   filed in December of 2019, and it was filed amending the

2   ordinance after this action was filed.

3          And at issue in this case -- I think all you need to

4   look at is a couple of sections of the ordinance in

5   particular.  And I'll draw the Court's attention to Section 2,

6   which defines prohibited conduct.  That clearly says that if

7   the plaintiffs do not have the necessary City-issued

8   certificate, it's unlawful under the ordinance.

9          Then there's other sections that I believe are not

10  really at issue.  They talk about the procedure for applying

11  for a certificate, the procedure for inspections.  They

12  discuss administrative adjudication.

13         And in subsection -- in 5(g), that's another section

14  I think that really the Court needs to look at in this case.

15         And it -- (audio transmission interrupted) -- it

16  specifies that in the event that an owner or occupant refuses

17  to schedule an inspection, that the City -- and the ordinance

18  was amended -- and the City reserves the right to seek an

19  administrative search warrant.

20         Section 6 deals with the administrative adjudication.

21         And then, most importantly in this case, is Section

22  9(c) dealing with penalty.

23         It specifically provides that an owner, agent, or

24  occupant's refusal to permit an inspection or re-inspection,

25  quote, shall not be considered a violation of this section and

1    shall not result in the issuance of any fines or penalties.

2         Contrary to the plaintiffs' argument at page 7 of

3    their answer memorandum, we don't contend that the plaintiff

4    must submit to the challenged unconstitutional conduct in

5    order to have standing.  That is not our position in this

6    case.

7         The parties are in agreement that in order to have

8    standing, that the plaintiff must allege injury in fact as it

9    relates to all of the different forms of relief being sought.

10        And there is -- appears to be a disagreement as to

11   the appropriate standard.

12        It's the defendants' position that in order to

13   establish injury in fact, it can't be speculative.  And under

14   the Supreme Court decision in Clapper, they use the term that

15   the injury in fact must be, quote, certainly impending, close

16   quote.

17        Plaintiffs cite to this Court in their reply -- in

18   their answer memorandum -- a decision of -- a later decision

19   of the Supreme Court in Susan B. Anthony.  And they maintain

20   that the standard in determining the injury in fact is simply

21   a substantial risk of injury, which they contend is a lower

22   hurdle than the certainly impending standard in Clapper.

23        What I'd like to point out is how they misread the

24   decision in Susan B. Anthony.  Where the court in Susan B.

25   Anthony referred to the Clapper decision, it said, at

1    page 150, I believe it was -- and I'm sorry -- at page 158 of

2    the U.S. reporters.  It says, quote, an allegation of future

3    injury may suffice if the threatened injury is, quote,

4    certainly impending, close quote, or there is a, quote,

5    substantial risk, close quote, that the harm will occur.  And

6    they cite to footnote 5 in the Clapper decision.

7            Plaintiffs' counsel sieges upon this language of

8    substantial risk and maintains that's a different standard and

9    it's really a lower hurdle.  That argument must be rejected.

10           And I would direct the Court's attention to note 5 of

11   the Clapper decision that the Supreme Court in Susan B.

12   Anthony referred to.  And what they say in that footnote is

13   essentially that if you're going to look at a substantial risk

14   argument, there must be substantial risk plus.  And I'll quote

15   from the language of footnote 5 from Clapper.  It says, quote:

16   Our cases do not uniformly require plaintiffs to demonstrate

17   that it is literally certain that harms they identify will

18   come about.

19           And they go on to say:  In some instances, we have

20   standing based on a, quote, substantial risk, close quote,

21   that the harm will occur.  And then they add:  Which may

22   prompt plaintiffs to reasonably incur costs to mitigate or

23   avoid that harm.

24           In other words, if there is some risk -- in the words

25   of the court, a substantial risk -- and that causes the

1  plaintiffs -- or the possible injured parties to take

2  defensive action, then maybe a substantial risk will satisfy.

3          And they refer -- after that language, they refer to

4  the -- a prior Supreme Court decision in Monsanto Company v.

5  Geertson Seed.  And if the Court would look at that prior

6  decision, what was at issue in there -- the court found

7  standing.  But they found standing -- the case dealt with

8  Roundup Remedy Alfalfa -- or Roundup Ready Alfalfa.  It was an

9  alfalfa seed that was immune to the Roundup pest- -- or

10 herbicide.

11         And in that case, what the plaintiffs did and why the

12 court found that there was standing is that while there was a

13 substantial risk that seeds from a neighboring farm, which

14 were the -- which were the Roundup Ready seed, would flow onto

15 the property of organic farmers.  The organic farmers ended up

16 taking additional costs at that time to see if their crops had

17 been contaminated.  And as an example, what they had done in

18 that case is they had -- they were taking their own seeds and

19 sending it out for samples to see if their crop had, in fact,

20 been contaminated.

21         And that was the defensive action and the defensive

22 costs that the court found in Monsanto, coupled with the,

23 quote, substantial risk that the organic farmers' crops would

24 be contaminated by the genetically treated alfalfa, that the

25 court found there was standing.

1          So the court simply said, if there is a substantial

2    risk, plus that additional infor- -- plus that additional

3    injury, that satisfies the standing requirement.

4          And so that's why, in our view, their citation to

5    Susan B. Anthony and reliance upon the substantial risk

6    language is in opposite.

7          THE COURT:  So, Mr. Kurnik --

8          MR. KURNIK:  And I'll also point out at -- yes?

9          THE COURT:  I'm violating my oath here by

10   interrupting you, but I'm going to do it anyway.

11          If I understand your argument about reading Susan B.

12   Anthony and Clapper, your point essentially is that we can't

13   just read the quote on page 150 from Susan B. Anthony in

14   isolation; we have to look at it with the tone and color of

15   footnote 5 of Clapper.  Is that basically what you're saying?

16          MR. KURNIK:  That's it, Judge.  That's a -- a lot

17   less words than I used.

18          THE COURT:  Well, I --

19          MR. KURNIK:  But, yes, that's our position.

20          THE COURT:  That's only because you did articulate

21   your argument well, so I was able to get it.

22          But let me ask you this:  Is there any Seventh

23   Circuit case law dealing with this substantial risk versus

24   certainly impending language in the two Supreme Court cases

25   such that we can discern a gloss from the Seventh Circuit on

1   how district judges are to harmonize these two cases?

2          MR. KURNIK:  I looked, Judge, and I'm unaware of any

3   decision from the Seventh Circuit doing that --

4          THE COURT:  What about from the other --

5          MR. KURNIK:  -- at least from --

6          THE COURT:  -- circuits?

7          MR. KURNIK:  -- the arguments that I'm making.

8          I have not -- quite frankly, I did not look at other

9   circuits to see if other circuits had addressed that -- the

10  argument that we are advancing.

11         THE COURT:  Okay.  Thank you.  Please continue.

12         MR. KURNIK:  And I would also point out that --

13  dealing with Susan B. Anthony -- I would point out language at

14  166 of the U.S. reporter where they really didn't address this

15  "substantial" argument.  What they said is, quote:  Although

16  the threat of commission proceedings is a substantial one, we

17  need not decide whether that threat standing alone gives rise

18  to Article III injury.

19         What they went on to say is:  The burdensome

20  commission proceedings here are backed by the additional

21  threat of criminal prosecution.

22         And they concluded that it was the combination of

23  those two threats that gave rise to standing.

24         We don't have a threat of criminal prosecution in

25  this case.  So that's anther reason that Susan B.

1    Anthony should not be followed by this Court and is

2    distinguishable from the black letter law of Clapper, is what

3    I'll refer to.

4            And then the court finally noted that the threat -- a

5    threat of criminal prosecution -- and they're referring to --

6    this is language at page 164.  They said that the threat of

7    criminal prosecution in that case was not chimerical,

8    c-h-i-m-e-r-i-c-a-l -- I guess meaning really hypothetical or

9    non-existent.

10           So those are reasons why, your Honor, we say that

11   what the -- this Court should follow the language in Clapper

12   and look at certainly impending.

13           THE COURT:  Mr. Kurnik, you're not --

14           MR. KURNIK:  A couple of -- yes?

15           THE COURT:  You're not arguing that criminal

16   liability, potential or otherwise, is required for there to be

17   standing, are you?

18           MR. KURNIK:  I am not.  All I'm saying is that was

19   the additional fact in Susan B. Anthony that was present that

20   is not present in this case.

21           So I think the language of the court was simply

22   saying, you need not address the substantial risk of whether

23   that's enough because there's -- on top of that, there's

24   criminal -- there's a threat of criminal prosecution.  And it

25   is clear that that's -- that that's certainly almost a

1   certainty, in the words of the court.  They said it was not

2   chimerical.

3        But you are correct, we do not take the position that

4   there must be a threat of criminal prosecution.  We take the

5   position that it must be certainly impending.  And given

6   paragraph 9(c) of the ordinance, it is not certainly

7   impending.  There is -- they -- that section of the code says

8   that a refusal to consent shall not be viewed as a violation

9   of our ordinance.

10       And I don't know what more to say about the fact that

11   that section negates any injury to them or any threat or any

12   issue that their -- the inflic- -- infraction upon their

13   rights are, quote, certainly impending.

14       So that's the basis, your Honor, for our argument,

15   that the certainly impending standard applies.

16       I would just simply like to address one other Seventh

17   Circuit opinion that the plaintiffs rely upon.  That's the

18   Remijas v. Neiman Marcus case, or one of my colleagues used to

19   refer to them as the needless markups.  There, what

20   distinguishes that case -- and it doesn't really stand for the

21   proposition that the plaintiffs are advancing.  They suggest

22   that it was a forerunner or ultimately predicted the Susan B.

23   Anthony argument.  What they held were there was -- there was

24   in fact a breach of the computers of Neiman Marcus.  There was

25   in fact in that case theft of credit card information.

1           And like Monsanto, there was in fact protective

2   action that people had taken.  The court referred to Experian

3   costs and that some of the credit card holders, who were

4   plaintiffs in that case, you know, had subscribed to credit

5   monitoring expense -- or incurred credit monitoring expenses.

6   And that was at page 694.

7           And they also noted that customers had in fact had

8   fraudulent charges and received notices that their cards were

9   compromised.

10          And the court said there was no need to speculate

11  whether information was in fact stolen.  And, essentially, why

12  else steal information if you're not going to use it?  And the

13  court said -- the court said there was no need to speculate

14  whether information was in fact stolen.

15          And they also commented -- they said they weren't

16  going to overreach, I think, with the language of Clapper --

17  you know, there's the Clapper reference to "may" -- should be

18  disregarded; and here that there was certainty that there was

19  damages; that in fact that there was a breach.  So the injury

20  occurred in that case.  The injury was not speculative.  So

21  that's how the Remijas case does not help the plaintiffs in

22  any way.

23          The remainder of my outline -- well, I'll just -- I

24  want to address -- one comment.

25          It's paragraph 71 and 72 of the second amended

1   complaint that they speculate is a basis --

2     (Brief pause.)

3       THE COURT:  Mr. Kurnik, are you still there?  If you

4   are, we've lost you.

5     (Brief pause.)

6       THE COURT:  Or we can't hear you at least.

7       Do any of our plaintiffs' counsel -- can any of you

8   hear me?

9     (Brief pause.)

10      THE COURT:  Do we have anybody from the plaintiff who

11  can hear me?

12    (Brief pause.)

13     THE COURT:  If anybody can hear me, we cannot hear

14  anyone else.  We will go off the record for a moment here

15  while we address our technical issues.  Please stand by.

16    (Brief recess.)

17     THE CLERK:  Calling 19 cv 6411, Lozano v. City of

18  Zion.

19     THE COURT:  Good afternoon.  This is the judge.  The

20  record will reflect that we, on the Court's side, dropped

21  everyone.  I don't know if anyone could hear us.  Apparently

22  you could not.  We couldn't hear anyone else.

23     The last thing that Mr. Kurnik said that I heard was,

24  in summary, he started referring to paragraphs 71 and 72 of

25  the amended complaint; and he said that there was a

 1   speculation based on that.  And then we dropped.

 2          So if that jogs your memory, Mr. Kurnik, please

 3   summarize from there.  And then if you could wrap up in a

 4   couple of minutes, that would be helpful.  I'm again going to

 5   apologize to everyone on the call for the technical challenge,

 6   but welcome to our life over the past 14 months.

 7          So, Mr. Kurnik, can you go back and have I jogged

 8   your memory sufficiently to know where --

 9          MR. KURNIK:  I will --

10          THE COURT:  -- to start?

11          MR. KURNIK:  I will do my best, your Honor.  I'm

12   looking at my notes.

13          I simply -- where I was going, Judge, is simply

14   because there may be conduct that may be unlawful under a

15   statute, if there's no threat of prosecution under a statute,

16   that doesn't make the injury certainly impending and refer to

17   how many -- you know, how many unconstitutional statutes that

18   we have on the books in some states that go back to the

19   mid-1800s that are really not enforced.

20          And I also pointed out that, that aside, Section 9(c)

21   specifically says, if -- if you refuse to consent, that's not

22   to be viewed as a violation.  In other words, if the you seek

23   to enforce your constitutional rights, that should be not

24   viewed as a -- that is not a violation, and there would be no

25   fines imposed.  That's the specific language of 9(c).

1          The only other comment I wanted to make is that one

2   of the decisions relied upon by the plaintiffs in their

3   response memorandum was a district court opinion, I want to

4   say, out of Pennsylvania.  It's the Dearmore case.  That is

5   the only case that -- a district court opinion that they cited

6   that addressed standing.  But, there in that case, the

7   plaintiff was an apartment owner, not -- not a -- not an

8   occupant.  And the City had contended that standing did not

9   exist because the apartment owner did not have the right of

10  privacy.  They never addressed -- they never argued that

11  injury was not certainly impending.  So the court there just

12  summarily addressed whether injury in fact occurred and didn't

13  go into any analysis about whether or not injury was certainly

14  impending.  So that's an additional reason that I suggest the

15  Court should not be guided by another district court opinion

16  in Dearmore.

17          With that, your Honor, I have nothing further to say.

18          THE COURT:  Thank you, Mr. Kurnik.  I have a couple

19  of questions for you.

20          First of all, as we are sitting virtually here today,

21  does Ms. Lozano have a certificate of compliance from the

22  City?

23          MR. KURNIK:  Lozano?  Not for these specific

24  apartments.  As I understand it -- and plaintiffs can correct

25  me -- that with respect to other tenants, tenants had

1  consented and there had been inspections.

2          But as to these three apartments -- actually two now

3  because one of the plaintiffs moved out and withdrew from the

4  case.  So as to those two apartments, there is not a

5  certificate of compliance.

6          THE COURT:  Right.  And I should have been clearer in

7  my question.  With respect to the apartments at issue in this

8  case, Ms. Lozano does not have a certificate of compliance

9  today?

10          MR. KURNIK:  That's correct.  That is correct.

11          THE COURT:  So is she then currently in violation of

12  Section 10-180 subsection -- whatever it is -- 2, 2(a) that

13  says --

14          MR. KURNIK:  I --

15          THE COURT:  -- under prohibited conduct, it says that

16  it shall be unlawful for any person to let to another -- I'm

17  summarizing -- an apartment without a current and valid City-

18  issued certificate of compliance?

19          MR. KURNIK:  By virtue of the operation of

20  subsection 9(c), no.

21          THE COURT:  She is not in violation of the ordinance?

22          MR. KURNIK:  She is -- by virtue of the -- had it not

23  been -- well, absent 9(c), she would be in violation.  But the

24  amendment to the City ordinance that's at issue in this case

25  added subparagraph 9(c).  And as I've quoted -- let me get it

1  here, your Honor.

2         As I quoted before, it specifically says:  An owner

3  property agent, or occupant's refusal to permit the City to

4  perform an inspection or re-inspection shall not be considered

5  a violation of this section.

6         THE COURT:  Okay.  But I read that language possibly

7  a little bit differently.  So if we were to ignore the

8  inspection issue and just focus strictly on the language of

9  Section 2(a) that says it shall be unlawful to rent an

10  apartment without a valid certificate of compliance -- and I'm

11  summarizing of course -- if we were to focus only on that

12  language, isn't it correct that Ms. Lozano is in violation of

13  the ordinance merely by virtue --

14         MR. KURNIK:  Correct.

15         THE COURT:  -- of letting an apartment?

16         MR. KURNIK:  Correct.

17         THE COURT:  How am I then supposed to read -- or how

18  would anyone then be able to read in any reasonable way

19  Section 9(c) that is phrased a little bit differently.

20  Specifically, it says it shall not be considered a violation

21  of this section to refuse to permit an inspection and it will

22  not result in the issuance of any fines or penalties.  Okay,

23  fine.

24         But how can you read that language to write out or

25  vitiate the prohibition under Section 2(a)?  That's what I'm

1    not quite following.

2           MR. KURNIK:  Well, I think there may be other --

3    other bases for violations.  If they don't apply, that could

4    be viewed as a violation.

5           THE COURT:  But you're --

6           MR. KURNIK:  In other words, if --

7           THE COURT:  -- you're -- you are talking about causes

8    for the violation.  I'm talking about the violation per se,

9    the violation itself.

10          MR. KURNIK:  Okay.  Well, I -- let me -- my view is

11   the ordinance requires, as an example, that a business owner

12   applies.  If a business owner doesn't apply, that would be a

13   violat- -- or, I mean, if a property owner does not apply,

14   that would be one example of a violation of the ordinance.

15   That basis or that type of a violation is not covered by 9(c).

16   So that's how we would give force and effect to both sections.

17   If they apply and during the application process a property --

18   an occupant says, I'm not going to consent, that then would be

19   a violation that's covered by 9(c).  So there are

20   circumstances where there could be a violation that doesn't

21   arise out of a refusal to permit an inspection.

22          THE COURT:  Right.  But my question --

23          MR. KURNIK:  So --

24          THE COURT:  -- only goes to the very black-and-white

25   issue of Sections -- really this goes to all of the

1    plaintiffs -- Sections 2(a) and 2(c).

2              2(a) says plainly -- and I'm a plain-language kind of

3    person -- it says:  It shall be unlawful for any person to let

4    to another, for use or occupancy, any residential rental

5    property without a current and valid City-issued certificate

6    of compliance.  Period.  Hard stop.

7              And then --

8              MR. KURNIK:  Right.

9              THE COURT:  -- subsection (c) says:  It is unlawful

10   for any person to occupy a residential rental property that

11   does not have a valid City-issued certificate of compliance.

12   Period.

13             It doesn't cross-reference any other part of the

14   ordinance.  It doesn't qualify it.  It doesn't say or speak to

15   any of the reasons for why that landlord or tenant might not

16   have a certificate of compliance.  It just says, you can't do

17   that.

18             Am I reading that incorrectly, Mr. Kurnik?

19             MR. KURNIK:  No, you -- no, you are reading the

20   section correctly.  So a refusal, you know -- you are reading

21   the section correctly.  But just because there may be a

22   violation of that section does not result automatically in

23   standing.

24             What is the injury?  There must be an injury in fact

25   and the injury in fact must be certainly impending.  Okay.

1    And your reading, at least as I understand it, renders 9(c) a

2    nullity --

3                THE COURT:  Well, I don't agree --

4                MR. KURNIK:  -- because --

5                THE COURT:  I don't agree with that.

6                MR. KURNIK:  But --

7                THE COURT:  I'll just ask you point blank.  You keep

8    focusing -- and I understand this; I'm questioning you because

9    this helps me understand the case.  I'm not going to expect

10   that you agree with me.  I always hated it as a practitioner

11   when I felt like judges were trying to force me to agree with

12   them.  I'm not going to do that, but I am going to look for

13   answers to my questions.  And one of them is that you keep

14   referring back, understandably, to the "certainly impending"

15   language.  But part of my analysis of whether an injury is

16   certainly impending is going to be whether there's a threat of

17   some sort of action, some sort of legal action by the City

18   against these plaintiffs.

19               So I'll cut to the chase and ask:  Is the City of

20   Zion representing that it is not intending -- absent an

21   inspection or regardless of the inspection issue -- are you

22   representing that there will be no action against any of these

23   plaintiffs based on the fact that they don't currently either

24   have a certificate of compliance or reside in a rental

25   property that does not have a valid certificate of compliance?

1    Is that your representation?

2         MR. KURNIK:  Well, it depends what you mean by

3    "action."  If you mean by action that we're not going to apply

4    for a warrant and come within -- come within Camara, I will

5    not commit to that.

6         My -- and -- I will commit -- I have to clear it with

7    my clients; I'm just their attorneys.  My understanding and --

8    that the City will agree that they will not seek the

9    imposition of fines or -- well, whatever is covered.  They

10   will not result in -- they will not seek any fines or

11   penalties based upon the refusal of these plaintiffs to permit

12   an inspection.

13        THE COURT:  But that's not my question.  And I want

14   to be careful analytically here to keep this within the bounds

15   of what my question is.

16        My question is that, as I understand the state of the

17   record right now, there is no dispute between the parties that

18   the plaintiff, the plaintiff Lozano, Ms. Lozano, does not have

19   a certificate of compliance for the property that she is

20   letting.  The tenants do not reside in a rental property that

21   has a City-issued certificate of compliance.  Based solely on

22   those facts, the absence of a certificate of compliance, will

23   the City seek to take any action -- leaving aside the

24   inspection; forget the inspection -- will the City seek to

25   take any action against any of those plaintiffs based on the

1  mere fact that there is not a valid City-issued certificate of

2  compliance in place?

3      MR. KURNIK:  Your Honor, I asked the question.  I

4  don't know what falls within "any action."  If you exclude --

5  you know, I -- the City may very well and will not concede

6  that it is not going to seek a warrant.

7      THE COURT:  Okay.  Let me stop you there.  Let me

8  stop you there because this is helping me to understand the

9  nature of the dispute.

10      But let's add a detail to what I'm asking; and, that

11 is, we will carve out the seeking an administrative warrant

12 act.  But leaving aside whether the City would seek an

13 administrative warrant, would the City take any other kind of

14 enforcement action, such as a fine, such as seeking to -- and

15 I don't know if this is even possible -- but such as seeking

16 to foreclose on the property or prevent occupancy, seek an

17 order from state court preventing occupancy, or any other kind

18 of action, other than seeking an administrative warrant based

19 solely on the lack of a certificate of compliance being in

20 place?

21      MR. KURNIK:  Okay.  Your Honor, I will -- for the

22 record, I will state that that is my understanding.  And I

23 would like leave to submit that stipulation of record after

24 consulting with my clients because I really don't have the

25 authority to make that representation.

1          I was prepared --

2          THE COURT:  And that's fair.

3          MR. KURNIK:  -- to argue standing.

4          THE COURT:  That is completely fair.  I'm not going

5    to put you, the lawyer, in a position of binding your client

6    or yourself in something.  These are questions that I'm trying

7    to get answers to, and you are answering them.  But I will

8    certainly give you that opportunity.

9          But what it really points up for me is one of the

10   issues, which is, this seeking an administrative warrant.  My

11   understanding of the case -- and I will ask the plaintiffs

12   this or they can clarify this for me when we get to them,

13   which I have to do here very shortly -- I don't think the

14   plaintiffs have any objection to the act of the City seeking

15   an administrative warrant, nor would they have any objection,

16   even if they could have one, which I'm not sure they could, to

17   complying or submitting to the execution of a valid

18   administrative warrant.

19         In other words, any one of the plaintiffs could say,

20   no, I refuse to consent to a search, therefore, you need to

21   go -- you, the City -- need to go and get an administrative

22   warrant.  And if the City is able successfully to obtain such

23   a warrant and the City inspectors showed up armed with said

24   warrant, I think the plaintiffs would say, the City has

25   done -- has engaged in a lawful act and we will comply with

1    that.  I think that's their position, assuming no fraud or

2    anything like that, which is not at issue here.

3           But I think that's their position, is that we want a

4    neutral and detached magistrate to be interposed between the

5    police power of the City and the intrusion into our private

6    spaces.  I think that's their position.  They can correct me.

7           All right.  This is helpful.  Thank you very much,

8    Mr. Kurnik.  I'm going to have to turn to the plaintiffs now

9    and hear from them, and then I'll probably follow up with a

10   few more questions.

11          Who is going to speak on behalf of the plaintiffs?

12          MR. PECCOLA:  This is Rob Peccola on behalf of the

13   plaintiffs, your Honor.

14          THE COURT:  Thank you.  You may proceed.

15          MR. PECCOLA:  Your Honor, we represent a landlady in

16   Zion, Josefina Lozano, and her tenants, Mr. and Mrs. Pierce.

17   Mr. and Mrs. Pierce objected to an inspection of the interior

18   spaces of their home without a search warrant.  Rather than

19   issuing a certificate of occupancy without the inspection, the

20   City of Zion proceeded to send a threatening letter to

21   Ms. Lozano, threatening legal action against her for her

22   tenant asserting their constitutional right to be free from a

23   warrantless inspection.

24          As a result, they are now living in illegal housing

25   in Zion.  And Ms. Lozano is renting illegal housing.  Having

 1   illegal housing can have collateral consequences on things

 2   like Ms. Lozano's credit, her ability to transfer the

 3   property.  And, of course, for the tenants, the consequences

 4   are even more grave because it can mean eviction or loss of

 5   their place to live.

 6          The only thing standing between the kind of ruinous

 7   fine that Zion issues for this kind of objection and our

 8   plaintiff is this federal lawsuit.  Plaintiff came to federal

 9   court two days before the legal action was commenced -- was

10   meant to start against Ms. Lozano by the City of Zion.

11          We know, based upon the policies and practices

12   alleged in paragraph 73 of our complaint, that Zion

13   intentionally has a policy and practice of not seeking search

14   warrants and, instead, essentially going for the financial

15   jugular.  The colleague of Ms. Lozano whose tenants objected

16   to the inspection were fined $114,000.

17          So when opposing counsel says that that presumes bad

18   faith, that's correct, your Honor.  As in so much

19   constitutional litigation, we are alleging not only an

20   ordinance that is unconstitutional but a policy and practice

21   of enforcing that ordinance that is also unconstitutional.

22   Those facts in this proceeding must all be presumed true.  And

23   to the extent that Zion would like to challenge those facts,

24   that's what discovery, summary judgment, or perhaps trial are

25   for, not at this pleading stage where the face of the

1   complaint is what governs.

2          Moreover, the plaintiffs have satisfied the standing

3   requirements here under any test, whether it's Clapper or

4   Susan B. Anthony. The harm is the illegal housing that they

5   are currently living in. And the threat of future harm is the

6   legal action that Zion said in writing it would take against

7   them for asserting their constitutional rights. That is a

8   claim that is live under both the prior ordinance, because

9   plaintiffs have a claim for damages, as well as the current

10   ordinance, which governs plaintiffs' claims for declaratory

11   and injunctive relief going forward.

12          Anything to the contrary would require plaintiffs to

13   either suffer the fines and legal proceedings that Zion has

14   threatened them with or to consent to a search of their home

15   without a warrant and without their consent. Both of those

16   would render their Fourth Amendment rights illusory.

17          Moreover, under the reasoning of the Remijas case in

18   the Seventh Circuit, it specifically said, at page 693, that,

19   quote, it is important not to overread Clapper. Clapper was

20   addressing speculative harm based on something that may not

21   even have happened to some or all of the plaintiffs.

22          In our case, it already happened. They refused the

23   inspection. The City threatened their landlady and, save for

24   this intervention by the federal court looking over their

25   shoulder, they would have it assuredly happen. So it is for

 1   those reasons that plaintiffs, under both iterations of this
 2   ordinance, have standing.

 3        Contrary to the argument that Zion made, moreover,
 4   the Dearmore case, which was out of the district court in
 5   Texas, is right on point.  The issue before the court there
 6   with regard to standing was whether there was a concrete
 7   injury that was actual or imminent based on involuntary
 8   consent in order to receive a permit or to risk being cited
 9   for a separate offense each day.  That's 400 F. Supp. at 901.

10        That is exactly, to a letter, what happened here.
11   There was an involuntary consent demanded of the tenants in
12   this case, and there was a threat for citation against their
13   landlord.  So for Fourth Amendment standing purposes, that --
14   no more than that is required.  So Dearmore is right on point.

15        As for the other cases, I will rest on our brief,
16   only following up to say that this is a very serious matter.
17   When an inspection of a person's home happens, the inspector
18   can view all kinds of things about them, about their
19   political, religious beliefs, medications they might be
20   taking.  They can enter children's room without the consent of
21   the parent.  And they can have a complete wall-to-wall
22   knowledge of what is inside that person's home.

23        As your Honor said, that police power of the
24   government is very grave.  And nothing but a search warrant
25   supported by probable cause is enough for Zion to get through

1    the threshold of that door without the tenant's consent.

2         Moreover, to threaten the landlord of the tenant who

3    does not consent with fines and fees is an unconstitutional

4    condition on those Fourth Amendment rights.  And it threatens,

5    not speculatively or conjecturally, but in real life.  And the

6    reason this case was brought was the -- seeking a temporary

7    restraining order to stop that from happening.

8         So the combination of the threats against Ms. Lozano

9    and the current illegal status of both Ms. Lozano's property

10   and Mr. and Mrs. Pierce's dwelling, along with the fact that

11   there is an allegation here that this is -- none of this is by

12   accident; that Zion has intentionally done this pursuant to an

13   unconstitutional policy and practice of using fines in order

14   to punish tenants, secure revenue, and scare landlords, all of

15   those allegations must be taken as true at this stage of the

16   proceedings.  To the extent Zion wishes to refute those

17   allegations, that's what discovery is for.

18        So, your Honor, the plaintiffs would respectfully

19   request that you deny the motion to dismiss and allow this

20   case to go forward to discovery for factual development.

21        THE COURT:  Thank you.  A couple of questions for

22   you, please.

23        First of all, so I understand the contours of your

24   argument a little bit better, if the amended ordinance,

25   10-180, if the inspection portion of it -- give me one second

1    here, please.

2        (Brief pause.)

3            THE COURT:  I'm looking at 10-180 subsection 5.  Yes,

4    I'm trying to get the number right here.

5        (Audio transmission interrupted.)

6            THE COURT:  10-180 subsection 5, the inspections

7    portion.

8            By the way, I'm hearing a lot of wind noise or

9    something.  If somebody is outside or some other thing, if you

10   could just mute your phone until you're speaking, it would be

11   helpful.  Thank you.

12           10-180 subsection 5(g), Mr. Peccola, if the section

13   was rewritten such that it required the City or the City said

14   it will seek an administrative search warrant, otherwise, in

15   the absence of doing that, it wouldn't try to do the

16   inspection, if the language was such of that subsection that

17   it was either we'll seek a warrant or we won't try to do the

18   inspection outside of a warrant, would that satisfy what

19   you're seeking in this case?

20           MR. PECCOLA:  No, your Honor.  The first reason is

21   that the first iteration of the ordinance is alive and well

22   because the plaintiffs, in addition to their claim for

23   injunctive relief, are also seeking damages for retrospective

24   relief.

25           Number two, that does nothing to address the crux of

1   the ordinance where it begins with the prohibited conduct,

2   making the -- Mr. and Mrs. Pierce's home illegal and

3   Ms. Lozano's business illegal.  The -- whether or not they can

4   revoke a certificate of occupancy is irrelevant for purposes

5   here because they haven't and, to this day, refuse to issue

6   one in the first instance.  So --

7           THE COURT:  You keep saying a certificate of

8   occupancy.  I just want to make sure I have the language

9   right.  Is that the same thing as a certificate of compliance?

10          MR. PECCOLA:  Yeah.  I misspoke, your Honor.  Yes,

11  certificate of compliance.

12          THE COURT:  Okay.  But you're saying -- this is where

13  I'm getting a little bit confused.  Are you saying that the

14  requirement of 10-180 subsection 2, that that in and of

15  itself, the requirement of a certificate of compliance, is

16  unlawful?

17          MR. PECCOLA:  It is unlawful because it is premised

18  on a warrantless search.  And to go --

19          THE COURT:  Right.

20          MR. PECCOLA:  -- back to the --

21          THE COURT:  That's --

22          MR. PECCOLA:  -- question --

23          THE COURT:  Right.

24          MR. PECCOLA:  -- you asked earlier about --

25          THE COURT:  That's my question.

 1          MR. PECCOLA:  Right.

 2          THE COURT:  That's my question.

 3          MR. PECCOLA:  But --

 4          THE COURT:  Let me restate my question.  My question

 5    is:  If you take out the warrantless search option, if the

 6    option under the ordinance was you need a certificate of

 7    compliance; we want to be able to do inspections; but we're

 8    only going to do inspections if we have a valid warrant when

 9    somebody refuses an inspection, is that sufficient under your

10    theory of the case?

11          MR. PECCOLA:  If -- if Zion made a warrant under a

12    neutral magistrate, a precondition to the certificate of

13    compliance, then, yes, that's essentially, in fact, the relief

14    we're seeking in this case.

15          THE COURT:  Right.  Okay.  That's what I wanted to

16    clarify.

17          And, of course, we're talking about those situations

18    where a tenant doesn't give consent.  I mean, you can consent

19    until the cows come home, and it's not a Fourth Amendment

20    issue.  Assuming valid consent, that's fine.  But we're only

21    talking about situations where a tenant says, no, I'm not

22    going to permit you -- I'm not going to consent to you coming

23    into my dwelling to look at my dwelling.  Then the government

24    would have to -- the local government would have to get a

25    warrant by a neutral and detached magistrate.  In that

1   situation, if that was the only carve out for non-consenting

2   tenants, you're saying that that's fine under your view of the

3   case; that's the relief you're seeking, correct?

4         MR. PECCOLA:  That's right, your Honor.  And

5   precisely the fact that we know they have a policy and

6   practice of using fines and fees rather than search warrants

7   to go after tenants and landlords is part of the crux of the

8   case.

9         And the other is -- as you pointed out -- is that

10   they withhold these certificates of compliance as a means of

11   strong-arming both tenants and landlords to comply without the

12   safeguards of a search warrant issued by a detached

13   magistrate.

14         THE COURT:  Okay.  So let me ask you one more

15   question.  Obviously there's some interplay that goes on

16   between the different provisions of this ordinance, and that's

17   what I think Mr. Kurnik was trying to get me to see.  And I

18   understand why he was trying to do that.  You can't read all

19   of these sections completely in a vacuum.  I get that.

20         But when we look at this case as it's pleaded and as

21   it's at the motion to dismiss stage, let's assume that --

22   let's assume, and I know that Zion hasn't conceded this -- but

23   let's assume that the City stipulates that we are not going to

24   take any action against any of the plaintiffs based solely on

25   the fact that they do not have, either as a landlord or as a

1     tenant, a certificate of compliance.

2           If that stipulation was out there and it met all of

3     the other criteria, would that leave you without a case or

4     controversy?

5           MR. PECCOLA:  No.  The first reason being the

6     retrospective relief that we seek here, which even applies to

7     the unamended ordinance.  And the other is that that would be

8     wrongdoing that is capable of repetition, yet evading review.

9     It would not fix the constitutional harm to have voluntary

10    cessation strictly for purposes of knocking out plaintiffs

11    from a constitutional lawsuit, because that makes the

12    constitutional harm likely to reappear again.

13          THE COURT:  Thank you.

14          Let me ask you one more question before I turn back

15    to Mr. Kurnik, which is:  In general -- I'm guessing,

16    Mr. Peccola, you do housing ordinance cases nationwide; is

17    that accurate?

18          MR. PECCOLA:  Yes, your Honor.

19          THE COURT:  In general, is it the position of the

20    plaintiffs in this case, or your understanding more broadly,

21    that the general concept of allowing rental inspections -- or

22    inspections of property, rather, whether with -- assuming

23    there's a warrant or a consent -- is it your view that that is

24    something that's acceptable under the general police power of

25    the state?

1        MR. PECCOLA:  Yes, your Honor.  This is not a

2   challenge to rental inspections at large.  And as you pointed

3   out, it may well be that some tenants either don't have a

4   problem with the inspection or have reasons where they

5   voluntarily want to consent to the inspection.  That's fine.

6        But the Fourth Amendment doesn't address people who

7   consent to a search.  It goes to what happens and what

8   guardrails are in place for people who don't consent.  And we

9   believe that the -- it's a very valid thing for someone to not

10  want a government inspector in their most private spaces

11  without either their consent or a search warrant.

12       THE COURT:  I have one final, final question for you,

13  which is, just as a matter of curiosity -- it's not

14  particularly relevant to the issues here -- but what is the

15  situation when you have an ordinance where a municipality has

16  channeled into being required to seek a warrant for

17  non-consenting tenants as the only option?  In other words, if

18  there's not consent, then by the terms of the ordinance, the

19  municipality must seek a warrant.  What happens if a given

20  warrant application is denied?  Is the City simply out of luck

21  then in terms of attempting to -- or the municipality,

22  rather -- is it out of luck in terms of trying to conduct an

23  inspection?

24       MR. PECCOLA:  Yes, your Honor.  If there is no valid

25  search warrant, then the City comes in -- and the analogue in

1  criminal law is that it may well be that some criminals are

2  able to escape because there was a search warrant that was

3  denied.  But that's never the question under the Fourth

4  Amendment.  It's not whether there would be something

5  incriminating that could be found had the search warrant been

6  valid.  The question is only whether the privacy of the person

7  objecting is protected.  That's what the search warrant is

8  there for.

9          THE COURT:  Okay.  Thank you very much, Mr. --

10          MR. PECCOLA:  Now, the --

11          THE COURT:  Go ahead.

12          MR. PECCOLA:  Oh, I was just going to add, if I may,

13  that as a public-policy matter when it comes to housing, there

14  may well be other ways of addressing that.  Tenants are free

15  to self-report things.  And there can also be different -- you

16  know, whether it's a renters' hotline or something else that

17  cities can amplify, but not when it comes to violating

18  constitutional rights.

19          Thank you, your Honor.

20          THE COURT:  Thank you very much, Mr. Peccola.

21          I'll turn back to you, Mr. Kurnik.  If you could keep

22  it on the short side.  I have one or two more questions for

23  you, and then we'll wrap it up so you can get on with your

24  day.  I appreciate everybody's time.  But go ahead, Mr.

25  Kurnik.

1          MR. KURNIK:  "We're going to take you to court."

2   That is not enough to give them standing.  That is not enough.

3   They don't cite any cases.  They simply say, we're going to

4   have the courts resolve this.  That is a threat to their

5   constitutional rights?  They have not cited any case for that

6   proposition.

7          There -- Judge Coar in his -- you know, your Honor

8   talked about a warrant, if a warrant was mandatory.  In a case

9   before Judge Coar, the Makula case, as I recall, there was

10  no -- the obtaining a warrant was not mandatory, like it's not

11  mandatory in this case.  The court said, we're not going to

12  presume that the municipality is going to act

13  unconstitutionally in not obtaining a warrant or doing

14  something else.  I simply say, "We're going to take you to

15  court" does not give them standing even if that were a

16  certainty.  And, here, that's not -- that was not a certainty

17  as well.

18         So I -- and this capable of repetition in evading

19  review, those are propositions that apply in cases like

20  abortion cases.  That's not this type of case.

21         So I have nothing further to add.  If your Honor has

22  any other questions.

23         THE COURT:  Thank you, Mr. Kurnik.  If you could just

24  enlighten me quickly on a question that I have, which is --

25  and, again, this is another one of those questions that's

 1  really on the fringes of the issues of this case, but I'm

 2  curious more than anything.  What is your understanding of the

 3  purpose of holding a cudgel over the head of landlords to try

 4  to coerce conduct by a tenant?  In other words -- and I'm

 5  adopting a little bit of the tenor of the plaintiffs'

 6  argument, and I recognize that -- in other words, I'm not sure

 7  I understand what legal authority a landlord has to go and

 8  coerce a tenant's compliance or coerce a tenant into agreeing,

 9  quote/unquote, to a property inspection by a public official.

10  What is the basis for that?  My understanding -- and, again,

11  I'm operating purely off of intuition here and a few life

12  experiences, but I don't think a landlord has any kind of

13  formal right to demand that a tenant grant access to a

14  property.  Do they?

15           MR. KURNIK:  Well, your Honor, I'm not a landlord-

16  tenant specialist.  All I can tell you is on the few leases

17  that I've seen, I think it's common that landlords reserve the

18  right to enter the premises to inspect at reasonable times.

19  My understanding is those are in leases.  I could be mistaken.

20  But it would seem to me, as a matter of contract law, a

21  landlord can say, you're going -- it's a term of the lease,

22  you are going to allow me to come in and inspect your property

23  and to see if anything is going on that shouldn't go on.

24           THE COURT:  Right.

25           MR. KURNIK:  Now, the Constitution doesn't --

```
 1                    THE COURT:  That --

 2                    MR. KURNIK:  -- apply --

 3                    THE COURT:  That consent would -- assuming the terms

 4       of the lease say that -- that consent would go to the

 5       landlord.  I get that.  But would that consent extend to a

 6       once-removed level.  In other words, there was a doctrine in

 7       the Seventh Circuit at one time known as consent once removed.

 8       But that doctrine is no more.  That was the case of United

 9       States v. Rivera and Duenas, D-u-e-n-a-s.  It was a decision

10       from 2016.  But the Seventh Circuit was very exercised by the

11       idea that allowing one person consent into your property --

12       this was in the context, by the way, of a criminal case, a

13       drug search -- but they were very exercised and got rid of the

14       idea that if you gave consent to one person, that consent

15       could extend by one additional level to somebody else.

16                    So I'm not sure even if a lease said that you must

17       allow, by contract, the landlord into your property why that

18       would then allow the landlord to transfer that consent to the

19       City.  I don't understand that.  Can you explain that?

20                    MR. KURNIK:  Well, what if the lease said landlord or

21       its designee?

22                    THE COURT:  Well, I guess that would be possible, but

23       we don't have any facts to that level here.

24                    MR. KURNIK:  Correct, correct.

25                    THE COURT:  But assuming --
```

1          MR. KURNIK:  And I --

2          THE COURT:  -- assuming there isn't consent in the

3     language of the lease, I'm trying to understand, just as a

4     practical matter -- it's not going to be determinative of how

5     I see the case -- but as a practical matter, what is the

6     purpose that is being served by trying to get landlords to

7     beat up on tenants to grant access?

8          MR. KURNIK:  Well, I guess all I can say is there may

9     be circumstances, you know, where tenants are afraid to assert

10    their rights against a slum landlord.  And so, you know, the

11    city is maybe concerned in areas of Chicago where there are a

12    lot of substandard living -- apartments with substandard

13    living conditions where people don't have heat or what have

14    you, that they may be afraid to assert their rights -- you

15    know, rights that may exist under the Chicago municipal code.

16    So, you know, you have -- I mean, that's a hypothetical I

17    guess I would look at.  You know, then under those

18    circumstances, if the tenants -- you know, we may want to beat

19    up on landlords to say, we want to get in there because we're

20    afraid that the tenants aren't going to be -- are for one

21    reason or another unwilling to challenge the landlord.

22         THE COURT:  Okay.  Thank you, Mr. Kurnik.

23         My thanks to you and to Mr. Peccola and to everyone

24    else on the call for your time today.  I know it was a long

25    argument, but it's helpful to me to understand the case.  The

1  motion is taken under advisement.  We will do our best to get

2  a ruling out as soon as possible.  I can promise nothing more

3  concrete than that.

4       I will give the plaintiff one last chance to add

5  anything of an administrative nature.  I don't want to hear

6  any more argument.  But anything further in terms of the case

7  generally, Mr. Peccola?

8       MR. PECCOLA:  No other general administrative

9  concerns, your Honor, no.  Thank you.

10       THE COURT:  Thank you.

11       And, Mr. Kurnik, anything further?

12       MR. KURNIK:  Nothing further, your Honor.

13       THE COURT:  Thank you all.  I wish you a good

14  remainder of the week.  This concludes the hearing.  Have a

15  good afternoon.

16       MR. KURNIK:  You as well, your Honor.  Thank you.

17       MR. PECCOLA:  Thank you, your Honor.

18     (Which were all the proceedings held.)

19                    *    *    *    *    *

20

21  I certify that the foregoing is a correct transcript from the
   record of proceedings, held telephonically, in the
22  above-entitled matter.

23

24  /s/ Nancy C. LaBella               June 29, 2022
   Official Court Reporter
25